**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RICHARD FUNARI          *

       Plaintiff,        *

    v.               *      Civil No. 20-3474-SAG

DEPARTMENT OF PUBLIC SAFETY  *
AND CORRECTIONAL SERVICES, *et. al*
                       *

       Defendants.

                       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Department of Public Safety and Correctional Services, Lieutenant Faison, Lieutenant Reed, and Lieutenant Lann, by and through their attorneys Brian E. Frosh, Attorney General, and Sharon E. Conners, Assistant Attorney General, hereby submit this Memorandum of Law in Support of Defendant's Motion for Summary Judgment.

## I.   INTRODUCTION

Plaintiff's allegations stem from a use of force incident on October 18, 2019 during the process to secure his formal release from custody, and before he had actually been released or physically left the Maryland Reception, Diagnostic and Classification Center (MRDCC). Plaintiff, along with other inmates being processed for release, traveled to the medical unit to retrieve prescription medications. As he waited, Plaintiff encountered a newly admitted inmate and offered to exchange his State-issued boots for this inmate's white sneakers. Plaintiff acknowledges that Lt. Faison explicitly instructed him not to do so, but while her back was turned, Plaintiff proceeded to exchange shoes with this inmate.

As a result of refusing a direct order, Plaintiff was then instructed to return to his cell.

1

However, despite initial compliance, Plaintiff abruptly refused to walk toward the housing unit, refused additional orders to do so, and resisted handcuffing. Lt. Faison then called for assistance, and when additional officers arrived, Plaintiff became disorderly with Lt. Reed and Lt. Lann. In fact, as Lt. Lann escorted him to the housing unit, Plaintiff head-butted Lt. Lann and attempted to escape his grasp.

Plaintiff was then pepper sprayed and taken to the ground so that the correctional officers could regain control of the situation. He was then immediately taken to the medical unit for treatment of his pepper spray exposure, and his injuries were photographed. Plaintiff, however, offers a completely different and colorful version of events that includes approximately six unknown and unidentified correctional officers, kicking, punching, and pepper spraying him for over twenty minutes before returning him to the medical unit. These claims are unsupported, and Defendants are entitled to summary judgment in their favor.

## II.    **UNDISPUTED FACTS**

Plaintiff was an inmate with the Division of Correction who was transferred to MRDCC on October 17, 2019 from MCI-Hagerstown, and was scheduled to be released on October 18, 2019. Exhibit 1: Deposition of Richard Funari, P. 130, LL. 1-21. Lt. Faison was the intake and release officer working at MRDCC on the morning of October 18, 2019, and was assigned to complete the release process for Plaintiff and other inmates to be released that day. Exhibit 2: Deposition of Lt. Faison, P. 10. Plaintiff was housed in unit 3B, and at 10:30 a.m. on October 18, 2019, the inmates were brought down to be processed for release. Exhibit 1: P. 134.

### a.    Lt. Faison Initiated the Release Process

In preparation for the inmates' actual legal and physical release from the institution, their assigned case managers provider Lt. Faison with release packets that included a number of

different documents. <u>Exhibit 2</u>: P. 11, L. 17-19. As part of her duties as Releasing Lieutenant, Lt. Faison reviewed all of the release packets to ensure they included all necessary paperwork. <u>Exhibit 2</u>: P. 11, L. 19-24. This included medical certificates, release certificates, and information from the central repository. <u>Id</u>. In addition, there was a release envelope that "comes from the case managers from the institution where they're housed at. Some documents may be a birth certificate, an ID, a Social Security card, information package, and any other documentation that came maybe from a social worker from the institution," where the inmate had been housed. <u>Exhibit 2</u>: P. 11, L. 25; P. 12, L. 2-8.

With regard to the release packet itself, after the Releasing Lieutenant confirmed that all necessary documentation was enclosed, that documentation went to four different areas within the institution to ensure that all necessary paperwork has been signed off, and to confirm the proper identification of the inmate being released. <u>Exhibit 2</u>: P. 12, LL. 2-25; P. 13, LL. 2-22.

After all documentation and identification has been checked, the inmate was instructed to signs his release packet. <u>Exhibit 2</u>: P. 17, LL. 2-16. The Captain or Major on duty that day is then the last person to sign the release packet before an inmate is physically released from the facility. <u>Exhibit 2</u>: P. 17, LL. 9-16.

On October 18, 2019, once the inmates had been brought down to prepare for release, Lt. Faison confirmed their identities and escorted them to the medical unit for processing and to retrieve any necessary medication. <u>Id</u>. While in the medical unit, each inmate met with the nurse individually, and the other inmates awaiting release waited just outside the medical area. <u>Id</u>.

    b.   <u>Plaintiff Switched Shoes with Another Inmate, Defying a Direct Order</u>

While Plaintiff waited outside the medical area as other inmates met with the nurse, he was approached by an incoming inmate who asked to switch shoes. <u>Exhibit 1</u>: P. 138, LL. 9-21. At the

time, Plaintiff was wearing work boots issued to him by another institution; boots are not issued to inmates at MRDCC and generally not permitted there; Plaintiff was allowed to retain his work boots because he was transferred to MRDCC for release. <u>Exhibit 2</u>: P. 22, LL. 8-19.

In response to the incoming inmate's request, Plaintiff responded that if they wore the same size, Plaintiff would give the inmate his boots. <u>Exhibit 1</u>: P. 139, LL. 4-6. Lt. Faison overheard this conversation, and immediately intervened. "The Lieutenant heard us talking, she's like no, you all don't give him nothing. And technically the rules, you know, don't allow us to pass or give anything…" <u>Exhibit 1</u>: P. 139, LL. 11-17. Accordingly, Plaintiff was specifically instructed not to switch shoes with the incoming inmate, and knew that it was in violation of DPSCS policy to do so. <u>Id</u>.

After instructing Plaintiff not to exchange shoes with another inmate, Lt. Faison turned to assist other inmates in the medical office by retrieving their medications. <u>Exhibit 2</u>: P. 20, LL. 17-23.  When she turned back around, she noticed that Plaintiff was wearing white sneakers, and not the work boots he had been issued through DPSCS, and wearing only moments earlier. <u>Exhibit 2</u>: P. 21, LL. 2-8.

Lt. Faison then asked Plaintiff where his boots went, and he said that he did not know. <u>Exhibit 2</u>: P. 21, LL. 9-10. Lt. Faison then instructed Plaintiff that he was going back to his cell for disobeying a direct order. <u>Exhibit 2</u>: P. 21, LL. 10-12. Plaintiff initially began walking toward his housing unit, but then stopped short and said "[w]hat are we about to do?" <u>Id</u>. Lt. Faison replied that he was going back to his housing unit. <u>Exhibit 2</u>: P. 21, LL. 10-15. He then stated "oh, no, I ain't – I'm not about to do this, and he turned around and walked back towards the medical unit." <u>Exhibit 2</u>: P. 21, LL. 16-19.

After Plaintiff defied her order and refused instructions to return to his housing unit, Lt. Faison

called for assistance over the radio by requesting that available officers report to medical. Exhibit 2: P. 21, LL. 20-21; P. 25, LL. 5-20. Multiple officers responded to her call for assistance, and inquired as to the problem. Exhibit 2: P. 21, LL. 22-24. Lt. Faison explained that Plaintiff needed to be escorted back to his housing unit. A number of the responding officers were then relieved, and Plaintiff was escorted out of medical toward the housing unit. Exhibit 2: P. 22, LL. 2-6.

### c.   Lt. Lann First Arrived At Scene

Lt. Lann was one of the first officers to arrive in medical in response to Lt. Faison's call for assistance. Exhibit 3: Deposition of Lt. Lann, P. 9, L. 2-6. When he arrived, he asked what happened and Lt. Faison explained that Plaintiff needed to be escorted back to his housing unit "because he disobeyed a direct order." Exhibit 3: P. 9, LL. 6-9. Though she explained that Plaintiff had disobeyed a direct order, Lt. Faison did not tell Lt. Lann what order Plaintiff had disobeyed. Exhibit 3: P. 11, LL. 2-7.

Lt. Lann then approached Plaintiff and asked him to stand up so that he could be escorted back to his housing unit. Exhibit 3: P. 9, LL. 11-13. At first, Plaintiff complied and began walking toward his housing unit. However, his demeanor quickly changed, and he became combative within thirty (30) seconds of their initial encounter. Exhibit 3: P. 15, LL. 5-12. Plaintiff's behavior became "erratic" and Plaintiff continually attempted to pull away from Lt. Lann during the attempted escort back to the housing unit. Exhibit 3: P. 15, LL. 20-25.

Due to Plaintiff's continued resistance, Lt. Lann had to take Plaintiff to the ground to regain control of the situation. When Plaintiff refused to follow orders to walk to the housing unit, and resisted Lt. Lann's efforts to lead him, "that's when I grabbed him up and we all went down to the ground." Exhibit 3: P. 16, LL. 2-5. "He basically acted aggressive, aggressive because he didn't want to go back to the housing unit. He actually headbutted me, to be honest with you, you know."

<u>Exhibit 3</u>: P. 16, LL. 7-13, P. 18, LL. 18-22. Plaintiff was not handcuffed at this time.

In order to take Plaintiff to the ground, Lt. Lann "grabbed him by his forearm. Basically, he had his forearm into his back and we went to the ground." <u>Exhibit 3</u>: P. 20, LL. 10-14. When Lt. Lann got Plaintiff on the ground, he attempted to place handcuffs on him. That is when he realized another officer was assisting him. <u>Exhibit 3</u>: P. 21, LL. 5-23. Plaintiff continued to resist while on the ground, and a burst of pepper spray was deployed. Lt. Lann believed that it was Lt. Reed who deployed the pepper spray. <u>Exhibit 3</u>: P. 21, LL. 17-23. Lt. Reed was not present at the initial encounter outside the medical unit, but arrived a bit later during the occurrence and provided assistance to Lt. Lann. <u>Exhibit 3</u>: P. 13, LL. 24-25; P. 14, LL. 2-8.

Lt. Lann did not witness any other officer use force against Plaintiff other than Lt. Reed who used necessary force necessary to regain control of the situation, including the use of pepper spray and handcuffs. <u>Exhibit 3</u>: P. 24, LL. 2-5. After Plaintiff was maced and placed in handcuffs, he was taken directly to the medical unit for evaluation. <u>Exhibit 3</u>: P. 9, LL. 20-24. Plaintiff then got combative again while in the medical unit. <u>Exhibit 3</u>: P. 25, LL. 2-25. Lt. Lann did not utilize any force against Plaintiff except for the defensive takedown, and applying handcuffs. <u>Exhibit 3</u>: P. 23, LL. 20-25. He further did not punch Plaintiff, or witness any other individual punch Plaintiff at any time. <u>Exhibit 3</u>: P. 65, LL. 3-17.

Lt. Lann further explained that there are no tables or chairs in the hallway where the initial use of force took place. Instead, the only place that Plaintiff was taken by these officers that actually had chairs, tables or desks was in the medical area. <u>Exhibit 3</u>: P. 27, L. 12-25. Lt. Lann did not see any individual utilize force against Plaintiff except for the defensive takedowns and pepper spray, and did not witness any injuries on Plaintiff. <u>Exhibit 3</u>: P. 29, LL. 6-5; P. 30, LL. 2-3. Following the evaluation in the medical unit, he was escorted back to his housing unit. <u>Exhibit</u>

<u>3</u>: P. 9, LL. 23-25.

        d.   <u>Lt. Reed's Assistance During Use of Force in Progress</u>

Lt. Reed was a correctional officer at MRDCC who also responded to Lt. Faison's call for assistance. Lt. Reed was not one of the first officers to respond to the call for assistance, and as he came down the elevator to the scene he could hear loud voices through the corridor. <u>Exhibit 4</u>: Deposition of Lt. Reed, P. 5, LL. 16-25. He heard Lt. Faison tell Plaintiff "step back, go in the unit, whatever. And I could hear the loud voices coming through the corridor, you know, from where the elevators were to where they were." <u>Exhibit 4</u>: P. 5, LL. 16-25.

"When I got to where they were, Lieutenant Lann and Mr. Funari were kind of, like, struggling, like, Lann, you know, had grabbed him or whatever and Mr. Funari was taking his head, you look, looking backward to kind of, like, see where Lann head was, and he was, like, banging or moving his head back rapidly, like in a headbutting type of motion, to, like, headbutt Lieutenant Lann." <u>Exhibit 4</u>: P. 6, LL. 2-11. Lt. Reed then verbally instructed Plaintiff to stop, but Plaintiff refused so Lt. Reed deployed his pepper spray. <u>Exhibit 4</u>: P. 6, LL. 12-17. Lt. Reed ultimately decided to deploy his mace because he had been attempting to de-escalate the situation by giving verbal commands, but his commands and instructions were not being followed. <u>Exhibit 4</u>: P. 12, L. 20-25; P. 13, LL. 2-4.

In addition, Plaintiff was instructed to "step in" to the unit, to place his hands behind his back, and to stop resisting but he was not compliant with any of these orders. <u>Exhibit 4</u>: P. 15, LL. 2-17. Despite this, Plaintiff continued to struggle and was eventually taken down to the ground. <u>Exhibit 4</u>: P. 6, LL. 20-25; P. 7, LL. 2-4. Lts. Reed and Lann then gave Plaintiff verbal instructions to place his hands behind his back to be handcuffed, but Plaintiff continued to refuse these direct orders, and continue to resist their efforts. P. 7, LL. 5-13.

Lt. Reed and Lt. Lann then escorted Plaintiff to the medical unit to be treated after the use of force, because both macing an inmate and taking him to the ground are considered uses of force. P. 7, LL. 21-25. Plaintiff continued to be combative in the medical unit, and was again taken to the ground to regain control. P. 7, LL. 21-25. Plaintiff was then seen by the medical staff. P. 8, LL. 3-5.

Immediately following the incident, Lt. Reed authored his use of force report, which was then submitted to the shift commander. <u>Exhibit 4</u>: P. 26-28; P. 32. After he completed his report, he submitted it to Captain Singletary, and explained what had happened. <u>Exhibit 4</u>: P. 33, LL. 16-25; P. 34, LL. 2-6. Lt. Reed's only other interaction with Plaintiff was as Plaintiff was being released; Plaintiff approached Lt. Reed and apologized. "He said something to the effect of, tell the female lieutenant, you know, I'm sorry, I didn't mean to do that. I didn't really know what he was talking about, but that's what he said." <u>Exhibit 4</u>: P. 25, LL. 19-25; P. 26, LL. 2-4.

e. <u>Plaintiff's Medical Records Following Use of Force Incident</u>

Immediately following the Use of Force Incident, Plaintiff was taken to the medical unit for evaluation. *See e.g.* Exhibits 1, 2, 3, and 4. Nurse Annette Belin performed Plaintiff's medical evaluation immediately following the Use of Force incident, and her note reflects that "inmate seen and treated in clinic for use of force, inmate handed back over to custody in stable condition." <u>Exhibit 5</u>: Plaintiff's Medical Records.

She further noted, "Inmate observed with left side of face redness, and under left eye with small hematoma, scalf marks noted to upper left rib cage, and right back, small lump also noted on back of left head, lower lip also swollen, no other injury noted or reported, areas cleaned with NS and left open to air." <u>Id</u>. The section of the medical record inviting patient comment was left blank, indicating that Plaintiff did not voice concerns other than those previously noted. This is

consistent with the testimony of other individuals who were present during the physical evaluation. Exhibit 5. It is further consistent with the photographs that were taken, and further confirms that all of Plaintiff's injuries were in fact captured by the photographs included with the Use of Force Report. Exhibit 6: Use of Force Report.

      f.   Plaintiff's Claim that he was Officially Released Prior to the Incident

Plaintiff claims that he completed the paperwork required for his release while he was waiting outside of the medical unit, prior to the use of force incident. He further claims that he signed documents indicating that he had officially been released from DPSCS custody. In fact, when Plaintiff is being escorted to the housing unit, he stated, "I signed my release papers, you ain't got no business touching me. I'm like what are you trying to get sued? Like, don't touch me." Exhibit 1: P. 142, LL. 1-16.

However, contrary to this assertion, Cleveland Friday and every other correctional officer defendant clarified that while Plaintiff signed necessary documentation prior to his release – including the receipt of medications – no inmate is officially released from custody until they are escorted from the premises.

Specifically, when Cleveland Friday was asked, "In your mind, what is the final step that needs to be taken in order for Mr. Funari to be released from the facility?" Cleveland Friday responded, "Final step would be confirming who, in fact, he is. That's done from various systems that we have which would verify – its verified through his finger prints, it's verified pictorially, it's verified by asking him a serious of questions." Exhibit 7: Deposition of Cleveland Friday, P. 64, LL. 13-21. He continued, "Once all of that is done, he receives his release packet, which normally is any medication; if there's any money due, he receives up to $50 of said money, and then he is officially released **when we actually escort him off of State property.**" Exhibit 7: P.

64, LL. 22-25; P. 65, L. 1-2 (emphasis added). Cleveland Friday clarified that an inmate's signature on their release packet is the second to last thing, then after the inmate signs for his money and medications, they are given to him and he is directed to exit State property. <u>Exhibit 7</u>: P. 65, L. 6-18; P. 66, L. 10-16.

  g. <u>Use of Force and IID Report</u>

  A Use of Force Report was authored as a result of this incident, as is standard operating procedure. <u>Exhibit 6</u>. In it, each staff member involved in the incident provided a narrative of the events that occurred. <u>Id</u>. This packet further includes photographs of the inmate as well as all staff members involved. <u>Id</u>. In this case, Lt. Willica Williams was the officer responsible for taking photographs, and she took photographs of Plaintiff Richard Funari as well Lt. Faison, Lt. Reed, and Lt. Lann. <u>Id</u>. None of the correctional officers photographed had any visible bruising or lacerations on their hands. <u>Id</u>.

  While she took photographs for the Use of Force Report, Lt. Williams spoke with Plaintiff. <u>Exhibit 8</u>: Deposition of Willica Williams, P. 84 LL. 1-25; P. 85, LL. 1-12.

  While she photographed Plaintiff and his injuries, he did not complain of pain in any specific area other than to explain that his eyes were burning. <u>Id.</u> He further did not request to remove his shirt for additional photographs, or complain of any pain to any part of his body that was not photographed. <u>Exhibit 8</u>: P. 84, L. 1-12. He did not attempt to remove any of his clothing to demonstrate or reflect any additional injuries. <u>Id</u>.

  In fact, while Lt. Williams was taking photographs, she did not personally witness any evidence of Plaintiff having being punched or kicked, and further did not see an of the bruising or scratches that were noted in Plaintiff's medical records. <u>Exhibit 8</u>: P. 83, L. 21-25. Despite not having seen evidence of such injuries, she believes them to be consistent with having been taken

to the ground during a use of force incident. <u>Exhibit 8</u>: P. 83, L. 14-20. Aside from his medical examination, Plaintiff did not make any complaints regarding physical injury before his release later that day, or otherwise complain that an assault had taken place. <u>Exhibit 8</u>: P. 84, LL. 23-25; P. 85, L. 1-2.

        h.   <u>Plaintiff's Allegations of Assault</u>

Plaintiff first contacted MRDCC to report the alleged assault on October 21, 2019, several days after his release from custody. <u>Exhibit 9</u>: DPSCS Intelligence & Investigation Division Incident Report ("IID Report"). The matter was assigned to Sgt. Owens for investigation, who attempted to contact Plaintiff to investigate his complaint, but was initially unsuccessful. <u>Id</u>. On March 3, 2020, several months after the alleged incident and without further contact or communication with Plaintiff, Plaintiff's attorney contacted the investigator and scheduled an interview for his client. <u>Id</u>. During the interview, for the first time Plaintiff claims that he was thrown on a desk, kicked, punched, maced several times. <u>Id</u>. Plaintiff then claimed that Sharlandrea Sharp might have been a witness to that incident. <u>Id</u>., P. 11. Now, however, Plaintiff claims that a female with the last name "Dennis" was also a witness to the incident. <u>Exhibit 10</u>: Plaintiff's Answers to Interrogatories.

However, contrary to Plaintiff's assertion, the punch list for the date and time in question – which reflects all correctional officers working at the time – indicates that no correctional officers by that name were working at the time of the Use of Force Incident. <u>Exhibit 11</u>: Punch List.

Similarly, the investigation revealed that Ms. Sharp did not witness Lt. Lann or Lt. Reed using force on any inmate. <u>Id</u>. She further clarified would have remembered the incident if someone had thrown an inmate on her desk. <u>Id.</u> In direct contradiction to the version of events provided by Plaintiff's only months following the alleged incident, at his deposition nearly three

(3) years after the incident, Plaintiff again claimed that he was thrown on a desk, but claimed that "the officer, Ms. Dennis, who was the one working the desk out there at that post. I heard her telling somebody, I don't know who, I already got maced." <u>Exhibit 1</u>: P. 146, L. 4-8. There was no mention of a correctional officer named Sharlandrea Sharp, or anything similar. *See e.g.* <u>Exhibit 1</u>.

Regardless of this later-discovered discrepancy, after interviewing Lt. Lann, Lt. Reed, Lt. Faison, COII Sharlandrea Sharp, and Warden Cleveland Friday, the IID investigator found there was no probable cause to charge the correctional officers for assaulting Plaintiff, and the case was closed. <u>Exhibit 9.</u> The Use of Force investigation similarly found that the force used to secure the situation was in accordance with the Use of Force Manual, and similarly found that the Use of Force incident was unavoidable. <u>Exhibit 6.</u> Plaintiff later claimed to have had hand and foot prints all over his body following the incident, but never requested that an investigator take photographs while at the institution, nor did he complain of any pain associated with such alleged injuries. *See e.g.* <u>Exhibit 8.</u>

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). Summary judgment is appropriate against a plaintiff who fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Essentially, "the moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex* at 323.

The Supreme Court has stated that this does not mean that any factual dispute will defeat a motion for summary judgment. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson* at 247 (emphasis in original). Failure to demonstrate a genuine issue for trial will result in a summary judgment. *Strag v. Rd. of Tr., Craven Comm. Coll.*, 55F.3d 943, 951 (4th Cir. 1995). The mere existence of a scintilla of evidence in support of a plaintiff's case is insufficient; there must be evidence on which a jury can reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

IV.    <u>**LEGAL ANALYSIS**</u>

     a.   <u>No Allegations of Force by Lt. Faison</u>

The bulk of Plaintiff's allegations against Defendants arise from allegations that a Use of Force incident escalated into an assault against Plaintiff. Specifically, Count I: Excessive Force,

Count II: Cruel and Unusual Punishment, and Count III: Battery, all require a level of force to have been utilized by a defendant. However, Plaintiff has offered no evidence – testimonial, documentary, or otherwise – to support a finding that Lt. Faison ever utilized any level of force against Plaintiff.

In fact, both Lt. Lann and Lt. Reed stated that while Lt. Faison called for assistance and advised that Plaintiff disobeyed a direct order, there was no testimony that Lt. Faison was involved in the use of force incident. Exhibit 6, Exhibits 1, 3, and 4. Specifically, there is no mention that Lt. Faison ever exerted any force against Plaintiff. When asked if Lt. Faison ever punched him or used pepper spray on him, Plaintiff responded "I'm not sure." Exhibit 1: P. 192, L. 8-14. "She was in the area and witnessed it at a bare minimum." Id.

Similarly, there are no documents that identify that Lt. Faison was actually involved in the Use of Force incident, other than for assistance after Plaintiff refused to follow an order. Accordingly, Plaintiff cannot establish that Lt. Faison was involved in any level of force, and therefore Lt. Faison is entitled to judgment as a matter of law on Counts I, II, and IV.

b. Defendants are Entitled to Qualified Immunity

Defendants are entitled to qualified immunity, and therefore judgment should be entered in their favor. It is clear from the facts identified above that Defendants did not violate any clearly established constitutional right of which a reasonable public official should have known. Thus they are entitled to qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988); *Young v. Lynch*, 846 F.2d 960, 963 (4th Cir. 1988).

Under the standard articulated in *Harlow*, whether prison officials are entitled to summary judgment based on qualified immunity turns on the "objective reasonableness of the action,

assessed in light of the legal rules that were 'clearly established at the time the action was taken.'" *Harlow v. Fitzgerald*, 457 U.S. at 818. Indeed, in *White v. Pauley*, _U.S._, 137 S. Ct. 548 (2017), the Supreme Court recently confirmed the importance of the defense of qualified immunity, stating that qualified immunity protects all but those who knowingly violate the law. (*quoting Mullenix v. Luna,* 577 U.S., at _, 136 S.Ct., at 308). Further, in *White v. Pauly*, _U.S._, 137 S. Ct. at 552, the Supreme Court emphatically confirmed once again that clearly established law for purposes of qualified immunity cannot be defined at an abstract level. The facts must be "particularized" to the facts of each case. *Id.*, quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

Once the defense of qualified immunity is raised, the burden is on Plaintiff to show that the defendants' conduct violated the law and that such law was clearly established when the alleged violation occurred. *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir.), *cert. denied*, 510 U.S. 996 (1993).

As referenced above, in order to state a claim against any Defendant in this matter, Plaintiff must demonstrate that "in light of pre-existing law, the unlawfulness of the official action was apparent." *Bryant*, 994 F.2d at 1086, *citing Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir.), *cert. denied*, 506 U.S. 905 (1992). Plaintiff cannot meet this burden. As set forth in detail above, Defendants' actions to regain control of a combative and disorderly inmate were objectively reasonable, particularly following his refusal to obey a direct order and refusal to be handcuffed. Defendants utilized only the force necessary to gain control of the situation, and followed departmental policy regarding use of force. Accordingly, Defendants did not violate a clearly established law, and are therefore entitled to qualified immunity. *Winfield* 106 F.3d at 532-33.

In addition, with regard to Plaintiff's allegations of assault, Plaintiff himself could not identify the officers allegedly responsible. First, though only three correctional officers were

identified as defendants, Plaintiff claimed that "I just know it was approximately around half a dozen officers," who responded to the call for assistance. Exhibit 1: P. 150 - 151. He then stated that two to three of them walked up to him, and closed in around him demanding that he get up. Exhibit 1: P. 4-16. When asked if he knew the names of any of these officers, he stated "[w]ell, I do believe that two of them was the Officers Lann and – what the hell is his name? I think it's – I'm sorry I cannot remember for s*** names." Exhibit 1: PP. 151-152. Plaintiff then goes on to allege and that an unnamed male officer punched him, and that an unnamed female officer punched him. Exhibit 1: PP. 143-144. He does not specifically state that he was assaulted by any of the named defendants. Id. In fact, when he asked how he identified the individual defendant officers named in his Complaint, he testified "[w]ell, I think it was a result of getting the logs or whatever and finding out who was working, who was there, and who responded to the – sorry who responded to the code. From that point it was kind of a simple deduction, which ones was which, you know." Exhibit 1: P. 164, L. 19-21; P. 165, L. 1-3.

In fact when asked, "So based on that, there were at least five people you don't know who punched you, you don't know the name of who punched you, you don't know the name of who sprayed you with pepper spray or mace, you named two correctional officers and alleged that they did all of those things?" Plaintiff responded, "Well, not alleged that they did everything – but yeah." Exhibit 1: P. 166, LL. 6-15. Finally, when asked "[s]o it's based on your testimony, you don't know who physically assaulted you?" Plaintiff responded, "Right." Exhibit 1: P. 167, LL. 2-5.

When further asked to elaborate who allegedly assaulted him, Plaintiff was similarly unable to do so. When asked, "[h]ow did you identify that those two individuals physically assaulted you when you just testified that you don't know who they were?" Plaintiff responded, "[y]eah, I had

said that like, as far as the names like – and putting names and everything, like with the exact – who did exactly what, but it was a matter of deduction and the description I gave, et cetera, and was like, yeah, that sounds like this one and that one." He continued, "You know, so yeah, we named them in the complaint and we knew they were the officers that took part. They were, you know, the officers that took part in the incident and responded to the – I'm sorry, the code that was called, so it was a matter of deduction." Exhibit 1: PP. 167-168.

Accordingly, it is clear that not only are Plaintiff's claims of an assault unfounded, and unsubstantiated, but that he cannot identify the individuals he believes to have perpetuated the alleged assault. Accordingly, because the three individual defendants acted in accordance with their law and training in response to an inmate who had disobeyed direct verbal orders, they are all entitled to qualified immunity.

### c. Plaintiff's Claim is Properly Measured by the 8th Amendment, not 4th Amendment Standard

Plaintiff claims that Defendants' alleged actions constituted excessive force under the 4th Amendment of the United States Constitution, and Article 24 of the Maryland Declaration of Rights. In doing so, Plaintiff asserts, without support, that Plaintiff did not engage in any criminal or illegal act or in violation of the policies of MRDCC. Specifically, Plaintiff argues that the actions of Defendants Faison, Lann, and Reed were "objectively unreasonably in light of the facts and circumstances confronting them." ECF 2: Plaintiff's Complaint. In fact, in direct contradiction of Plaintiff's claims, Plaintiff was issued an infraction as a result of his behavior on October 18, 2019. Exhibit 12: Plaintiff's Infraction.

Maryland Courts have held that the standard for analyzing excessive force claims under Article 24 is that of objective reasonableness as set forth in the U.S. Supreme Court's Fourth Amendment case of *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443

(1989). While the Courts have not reconciled whether pre-trial detainees are entitled to 4th or 14th Amendment protection, it is clear that in this situation that Plaintiff was neither a free citizen nor a pre-trial detainee. He was an inmate who had been sentenced to the Division of Correction, and had not yet been released from custody. Exhibit 7. As a result, any use of force is governed by the 8th Amendment to the U.S. Constitution. The less protective 8th Amendment standard applies after the State has complied with the constitutional guarantees provided by a criminal trial. *Graham v. Connor,* 490 U.S. 386, 387 (1989).

As described above, inmates are not officially released from custody until they are escorted from the premises. Exhibit 7: Deposition of Cleveland Friday. While Plaintiff claims to have signed a number of documents *in preparation for* his release, he had not yet been escorted from the premises, and his release had therefore not been effectuated. Instead, Plaintiff directly disobeyed an order not to switch shoes with another inmate while on the premises of MRDCC, and prior to the completion of his release from custody. He then complicated matters by continuing to disobey direct orders, and resisted handcuffing and his escort to the housing unit. Exhibits 1, 3, and 4. Plaintiff then refused to return to his cell, became combative, and was taken to the ground and later pepper sprayed to allow correctional officers to regain control of the situation. Id. Defendants were acting properly and in accordance with the Department's interest in maintaining safety and order in the institution.

Courts have regularly granted prisons broad authority to establish their own regulations to maintain the safety and security of the institution. Accordingly, Plaintiff was expected to obey all direct orders from correctional officers while on the compound. Accordingly, because he had not yet completed the release process, and had not been escorted from the premises, Plaintiff remained an inmate committed to the Division of Correction, and his claims are properly measured by the

8th Amendment.

> d. Cruel and Unusual Punishment – U.S. Const. 8th and 14th Amendments, and Maryland Declaration of Rights Articles 16, 24 & 25

>> i. Due Process Claims

Article 24 of the Maryland Declaration of Rights states:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md. Const. art. XXIV.

Article 24 is construed in *pari materia* with the Fourteenth Amendment, and confers due process rights under the Maryland Constitution. *Pickett v. Sears, Roebuck & Co.,* 365 Md. 67, 77-78 (2001). Supreme Court decisions interpreting the Due Process Clause "are practically direct authority for the meaning of the Maryland provision." *Garnett v. State,* 332 Md. 571, 613 n. 20 (1993). *See also Durham v. Fields*, 87 Md. App. 1, 9 (1991) (stating that "[b]oth [Article 19 and Article 24 of the Declaration of Rights]. . . have long been equated with the Federal due process clause and have been held to provide the same, but no greater, rights and protection"). Interpretations of the Fourteenth Amendment by the Supreme Court serve as "persuasive authority" for Article 24. *Id.,* at 77.

However, because Mr. Funari was not a pretrial detainee at the time of the occurrences alleged in the Amended Complaint, Plaintiff's claims are measured by the Eighth Amendment rather than Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979); *see also Belcher v. Oliver,* 898 F.2d 32, 33 (4th Cir. 1990); *Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir. 1988). However, even if Plaintiff's claims were to be measured by the Due Process Clause of the Fourteenth Amendment, the Court may look to Eighth Amendment

jurisprudence to determine if a constitutional violation has occurred, because "the same standards apply as for an Eighth Amendment claim brought by a convicted prisoner." *See King-Fields v. Leggett*, No. CIV.A. ELH-11-1491, 2014 WL 694969, at *10 (D. Md. Feb. 19, 2014) (applying Eighth Amendment analysis to failure-to-protect claim brought by a pretrial detainee) (citing, *inter alia*, *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir.2001)).

The Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 836-838 (1994), articulated the legal principles governing a sentenced prisoner's Eighth Amendment failure to protect claim. In order to succeed on such a claim, a prisoner must prove that the defendant (i) had knowledge of a substantial risk of serious harm and (ii) acted with deliberate indifference, a criminal recklessness standard, to the prisoner's safety. It is clear from the record in the instant case that Plaintiff can do neither.

The Supreme Court expressly rejected application of a solely objective test that would hold a defendant liable if he or she should have known of a risk of harm. *Farmer*, 511 U.S. at 837. The Court stated:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; *the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.*

*Id.* (emphasis added).

Thus, a two-part inquiry that includes both an objective and a subjective component must be satisfied before liability can be established. *See Raynor v. Pugh,* 817 F.3d 123, 127 (4th Cir. 2016). The objective inquiry asks whether the plaintiff has "'establish[ed] a serious deprivation of his rights in the form of a serious or significant physical or emotional injury,' or a substantial risk thereof." *Id.* (quoting *Danser v. Stansberry,* 772 F.3d 340, 346–47 (4th Cir. 2014)). To satisfy the subjective

component, the plaintiff must "show that the prison official had a 'sufficiently culpable state of mind,' which . . . consists of 'deliberate indifference to inmate health or safety.'" *Raynor*, 817 F.3d at 127 (quoting *Farmer,* 511 U.S. at 834). Under the subjective test, "actual knowledge of facts from which a reasonable person might have inferred the existence of the substantial and unique risk to [the prisoner] is not enough to establish a violation of the Eighth Amendment," because "the defendant official . . . *must actually have drawn the inference*." *Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997) (emphasis added).

In the instant matter, it is clear that Defendants Lann and Reed utilized only the amount of force necessary to gain compliance from an otherwise defiant and assaultive inmate. Plaintiff admitted to having defied a direct order from Lt. Faison, and refused to go with Lt. Lann when instructed. Then, as Plaintiff wildly swung his head in attempt to headbutt Lt. Lann, he was pepper sprayed and taken to the ground as he continued to refuse orders from correctional officers.

### ii. Excessive Force – Cruel and Unusual Punishment

A claim that prison officials used excessive force on an inmate and thereby inflicted cruel and unusual punishment in violation of the Eighth Amendment involves both objective and subjective elements. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998). The objective element of the analysis requires a determination whether the defendants' actions offend contemporary standards of decency. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To answer this question, the Court weighs five factors: 1) the need for the application of the force, 2) the relationship between the need for the use of force and the amount of force used, 3) the extent of the injury inflicted, 4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the defendants, and 5) any efforts made to temper the severity of the use of force. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The subjective element of the analysis requires a determination of "whether the force

was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.

In *Wilkins v. Gaddy*, 559 U.S. 34 (2010) the Supreme Court explained that its holding in *Hudson v. McMillian*[1] did not stand for the proposition that "a certain quantum of injury [needed to be] sustained to make out an excessive force claim, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. 34. The Court did not want an inmate who was the victim of excessive force to lose the ability to pursue an excessive force claim because he had "the good fortune to escape without serious injury." *Id.* at 38.

Absence of serious injury, however is not irrelevant. Absence of injury indicates that the amount of force, *if any*, was minuscule. A "push or shove" without any resulting discernible injury almost always fails to state a claim for excessive force because the Eighth Amendment's prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* (quoting *Hudson,* 503 U.S. at 9). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1024 (D. Md. 2003).

Here the record irrefutably demonstrates that the Plaintiff did not suffer an excessive use of force. What little force was used against the Plaintiff – use of pepper spray, and taking him to the ground - was necessary to maintain order. In addition, photographs taken following the incident reflect only injuries consistent with pepper spray, and not the use of force alleged. Exhibit 6: Use

---

[1] 503 U.S. 1 (1992).

of Force Report; <u>Exhibit 5</u>. Further, Lt. Williams physically viewed Plaintiff while taking the required photographs, and did not see any injuries to Plaintiff other than a red face from pepper spray exposure. <u>Exhibit 8</u>: PP. 84-85.

Though Plaintiff has made a number of unsupported and baseless allegations against Defendants, there are no material facts in dispute, and Defendants are entitled to judgment as a matter of law.

e. <u>False Imprisonment</u>

This Court has regularly held that "the necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification." *Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 654, 261 A.2d 731, 738 (1970).

"When the cases speak of legal justification we read this as equivalent to legal authority… Whatever technical distinction there may be between an 'arrest' and a 'detention' the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest." *Ashton v. Brown,* 339 Md. 70, 120 (1995) (quoting *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655 (1970)). Any exercise of force or threat of force which causes the plaintiff to be deprived of their liberty or to be compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment. *Mason*, 205 Md. 481.

In the instant matter, Plaintiff had been sentenced to the Division of Correction, and had not yet completed the release process. <u>Exhibit 2 & 7</u>. Prison officials, including correctional officers, are permitted to limit the movement of inmates within the prison facility. [A] central tenet of any prison administration . . . requires above all else that security, order, and discipline be maintained in what is obviously a volatile and potentially dangerous environment. *See Pell v.*

*Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804; *Procunier v. Martinez,* 416 U.S. at 412, 94 S.Ct. at 1810. *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) (emphasis added).

Plaintiff fully admits that he disobeyed a direct order from Lt. Faison. As perceived justification, he claims that he felt an authority figure had exceeded her authority, because he believed that he had been released. Exhibit 1: P. 190, L. 20-21; P. 191, L. 1.

However, as Plaintiff was fully aware, inmates are not permitted to exchange personal items for security reasons, and correctional officers are tasked with maintaining order within the institution. Further, Plaintiff was issued a notice of infraction as a result. Exhibit 12.

Defendants utilized only necessary force against Plaintiff once he refused a direct order from Lt. Faison, and resisted as Lt. Lann and later Lt. Reed attempted to escort him back to the housing unit to restore order and investigate who had Plaintiff's shoes. Plaintiff was ultimately released from custody on that same date, at approximately 5 p.m. Exhibit 13: Release Certificate and Traffic History. Plaintiff was not guaranteed a specific release time, and was not held past his release date.

Accordingly, it is clear that Defendants had legal justification for returning Plaintiff to his housing unit for a few additional hours, and they are therefore entitled to judgment as a matter of law.

f.   Battery

A battery is the intentional, unpermitted touching of the body of another that is harmful or offensive to the person who was touched. In order to be a battery, the touching must be harmful, unlawful, or offensive. *Jones v. Family Health Centers of Baltimore, Inc.,* 135 F. Supp. 3d 372 (D. Md. 2015). A touching is harmful if it causes physical pain, injury or illness. *Robinson v. Cutchin*, 140 F. Supp. 2d 488 (D. Md. 2001); *Priester v. Board of Appeals of Baltimore*

*County*, 233 Md. App. 514, 165 A.3d 644 (2017).

The intent element does not require not a specific desire to bring about a certain result, instead requires a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact. *Nelson v. Carroll,* 355 Md. 593, 735 A.2d 1096 (1999).

As set forth in detail above, in the instant matter there was no intent to unlawfully invade Plaintiff's well-being. To the contrary, Defendants lawfully utilized only the force necessary to control the situation, and maintain order and security at the institution. Accordingly, summary judgment in favor of the defendant correctional officers is appropriate in this case.

g. <u>Negligent Hiring, Training, Retention, and Supervision</u>

Count Six of Plaintiff's Amended Complaint is a Maryland state law claim for negligent hiring, training, retention, and supervision. To state such a claim, a plaintiff must allege that the supervisor knew or should have known of an employee's "conduct or general character which would have caused a prudent employer in those circumstances to have taken action." <u>Bryant v. Better Bus. Bureau</u>, 923 F. Supp. 720, 751 (D. Md. 1996). "Under Maryland law, an employer's liability in this regard is not to be reckoned simply by the happening of the injurious event. Rather, there must be a showing that the employer failed to use reasonable care in making inquiries about the potential employee…or in supervising or training the employee." <u>Gay v. United States</u>, 739 F. Supp. 275, 277 (D. Md. 1990)(citing <u>Cramer v. Housing Opportunities Comm'n</u>, 304 Md. 705, 501 A.2d 35 (1985)).

A plaintiff asserting a cause of action against an alleged employer for negligent hiring or retention of an employee must prove the following elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge

of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. Asphalt & Concrete Services, Inc. v. Perry, 221 Md. App. 235, 256, 108 A.3d 558, 570 (2015).

Further, the tort of negligent selection, training, or retention, like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach. *Id.* at 182.

Further, to constitute a proximate cause the training at issue must be "1) a cause in fact, and 2) a legally cognizable cause." *Pittway Corp. v. Collins,* 409 Md. 218, 243, 973 A.2d 771, 786 (2009).

As stated in this Court's April 8, 2022 Memorandum Opinion, "[w]ith respect to training, Plaintiff makes no specific allegations about any faulty training that was provided, or any training that should have been, but was not, provided to correctional officers at MRDCC." ECF 42, P. 9. This Court continued, "[t]hus, Plaintiff has not plausibly alleged that the officers' desicision to engage in the alleged intentional wrongful conduct (here, the physical assault of Plaintiff) resulted from some training deficiency." ECF 42, P. 9. See, e.g. McDowell v. Grimes, No. GLR-17-3200, 2018 WL 3756737, at *4 (D. Md. August 7, 2018)(explaining a failure to train claim requires plausible allegations "that the officer's conduct resulted from [the alleged deficient] training"). The Court further stated, "[t]he allegations here are not that the officers here were confused or misguided about whether they could act violently towards inmates in the facility, but that they intentionally engaged in such misconduct… The generic failure to train allegations cannot create an adequate link to the officers' alleged conduct." ECF 42, PP 9-10.

It is not enough for Plaintiff to make bald assertions of general knowledge or conduct without specific facts in support. A complaint must pass a plausibility test that "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949. Though Federal Rule of Civil Procedure 8 imposes no "hyper-technical" pleading requirements, it also "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Instead, Rule 8 "contemplate[s] the statement of *circumstances, occurrences, and events* in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 555 n.3 (emphasis added) (quoting 5 Wright & Miller, *Federal Practice and Procedure* § 1202 at 94-95 (3d ed. 2004)).

Here, Plaintiff has provided no specific facts to support his assertions that Defendants failed to train correctional officers, that correctional officers had violent tendencies toward inmates, that there existed a "lawless and ruthless environment" at MRDCC, or that Defendants ignored and/or encouraged the "violent behavior or lawless tendencies" of its employees.

Further, Plaintiff has not alleged, and cannot establish all elements necessary to support this claim. Specifically, Plaintiff cannot establish the incompetence of any of the correctional officers involved in the use of force incident. Similarly, even to assume that Plaintiff can establish staff or training incompetence, which Defendants do not concede, he cannot establish that such incompetence was the proximate cause of the alleged injuries.

In fact, discovery is now closed, and in Defendant's Interrogatories to Plaintiff, Plaintiff was asked "If you contend that any DPSCS policy either caused or contributed to your injury, identify the policy at issue, and explain how such policy either caused or contributed to the injury identified in your Amended Complaint." Exhibit 10.

In response, Plaintiff directed Defendants to his response to another interrogatory, in which he stated, "Plaintiff objects on the grounds that the information is in the possession and control of the Requesting Party. Plaintiff will supplement his response to this Interrogatory after he has had an opportunity to obtain the requested information through discovery." Id. No amendment or supplement to this Interrogatory was ever provided. Plaintiff was then asked in Interrogatory No. 24, "[i]f you contend that any DPSCS agent, employee, or any other state actor, personally caused or contributed to your injury, identify the specific individual(s), and explain in detail how such individual caused or contributed to your injury. If you rely specifically on a theory of *respondeat superior* or vicarious liability, please so state." Exhibit 10. In response, Plaintiff provided the exact same response, referring Defendants to the Answer to Interrogatory referenced above. Id. Similarly, no amendment or supplement to this Answer has been provided.

Accordingly, Plaintiff has not plausibly alleged – and cannot prove – that any of the complained-of conduct resulted from some failure to train. Accordingly, Plaintiff's claim against defendants must be dismissed, or in the alternative judgment must be entered in their favor.

h.  Gross Negligence

Gross negligence has often been defined as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope,* 402 Md. 157, 187, 935 A.2d 699, 717 (2007). Plaintiff has alleged that the correctional officer defendants were grossly negligent "when they restrained him, attacked him, and incarcerated him despite his having been released." ECF 27, P. 3.

Not only had Plaintiff not been released from custody, but Defendants were fully justified in restraining and exercising necessary force against Plaintiff due to his continued defiance of

verbal orders, and assaultive behavior toward correctional officers.

Plaintiff has not alleged, and the evidence does not support, that any of the defendants intentionally failed to perform a manifest duty in reckless disregard of consequences affecting life or property of another. Instead, Plaintiff admits that he defied Lt. Faison's direct order not to exchange shoes with an incoming inmate, and then resisted orders and guidance from other correctional officers when ordered to return to his housing unit.

From there, Plaintiff creates a narrative in which he claims to have been punched, kicked, and pepper sprayed a number of times, but does not allege that it was any of the identified defendants who actually engaged in such behavior. Accordingly, there are no material facts in dispute, and Defendants are entitled to judgment as a matter of law.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, there are no material facts in dispute, and Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

_____/s/_____
SHARON E. CONNERS
Assistant Attorney General
Federal Bar No. 30166
Office of the Attorney General
Department of Public Safety and
Correctional Services
6776 Reisterstown Road, Suite 311
Baltimore, MD 21215
T: (443) 240-7446
E-mail:  Sharon.Conners@maryland.gov
Attorney for Defendants
